EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Municipio de Aguada<br><br>Recurrido<br><br>v.<br><br>W Construction, LLC<br><br>Recurrido<br><br>Recovery Finance Limited<br><br>Peticionaria<br>_____<br><br>Municipio de Aguada<br><br>Recurrido<br><br>v.<br><br>W Construction, LLC<br><br>Peticionario<br><br>Recovery Finance Limited<br><br>Recurrido | Certiorari<br><br>2024 TSPR 69<br><br>213 DPR ___ |

Número del Caso:  CC-2023-0320 cons. con CC-2023-0322

Fecha:  21 de junio de 2024

Tribunal de Apelaciones:

    Panel I

**CC-2023-0320**

Representantes legales de la parte peticionaria:

    Lcdo. Antonio A. Arias Larcada
    Lcda. María C. Cartagena Cancel
    Lcda. Gabriela A. Pérez Vélez

Representante legal de la parte recurrida:

    Lcdo. José A. Medina Hernández

**CC-2023-0322**

Representante legal de la parte peticionaria:

    Lcdo. José O. Ramos González

Representante legal de la parte recurrida:

    Lcdo. José A. Medina Hernández

Materia: Obligaciones y Contratos – En cualquier tipo de contrato de servicios, la evaluación de un licitador no debe estar orientada en la ficción de que la experiencia de una compañía es independiente a la de sus integrantes.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Municipio de Aguada<br><br>Recurrido<br><br>v.<br><br>W Construction, LLC<br><br>Recurrido<br><br>Recovery Finance Limited<br><br>Peticionaria<br>_____<br>Municipio de Aguada<br><br>Recurrido<br><br>v.<br><br>W Construction, LLC<br><br>Peticionario<br><br>Recovery Finance Limited<br><br>Recurrido | CC-2023-0320<br>CC-2023-0322 | |

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 21 de junio de 2024.

En AEE v. Maxon, 163 DPR 434 (2004), pautamos que la experiencia de las empresas se mide a través de los seres humanos que la componen. Hoy nos toca aclarar si dicha norma aplica solamente a situaciones en las que se adquieren servicios de gran costo y sofisticación.

Por los fundamentos que expondremos a continuación, resolvemos en la negativa. Con esto reafirmamos que, en

cualquier tipo de contrato de servicios, la evaluación de un licitador no debe estar orientada en la ficción de que la experiencia de los empleados o directores es un concepto separado o diferente a la experiencia de la compañía.

I

El 16 de octubre de 2018, el Gobierno Municipal de Aguada publicó una solicitud de propuesta en el periódico Primera Hora en busca de otorgar un contrato para el recogido de los escombros producidos por el paso del huracán María en Puerto Rico. En la solicitud, denominada *Contrato a término para servicios de respuesta a desastres*, se establecieron tres criterios con los que tenían que cumplir las compañías interesadas en participar: (1) tener un mínimo de dos años de experiencia en operación logística para la recuperación de desastres y eliminación de escombros; (2) conocimiento y experiencia en los procedimientos de reembolso de asistencia pública de FEMA, y (3) haber provisto servicios similares a los requeridos por lo menos a una jurisdicción con una población de al menos diez mil (10,000) habitantes. Propuesta Núm. 2, Serie: 2018-2019. Los servicios serían sufragados, en su inmensa mayoría, por la Agencia Federal para el Manejo de Emergencias ("FEMA", por sus siglas en inglés) mediante pareo de fondos. El Municipio aportaría el 10% de los fondos, mientras que FEMA aportaría el 90% de estos.

Según consta en la *Notificación de adjudicación*, dos compañías sometieron sus propuestas ante la consideración de la Junta de Subastas del Municipio de Aguada (Junta de

Subastas): W Construction LLC (W Construction) y Constructora de Aguada Inc. Ap. del certiorari, pág. 399. Después de haber evaluado las ofertas recibidas, el 4 de diciembre de 2018 la Junta de Subastas acordó por unanimidad otorgar la buena pro a W Construction, por entender que esta "cumplió con todos y cada uno de los requisitos establecidos". Íd. Por ello, el 11 de diciembre de 2018 se perfeccionó el Contrato Núm. 2019-000159 (Contrato de Servicios) entre el Municipio de Aguada y W Construction por la cantidad de $3,000,000. Mediante dicho contrato, que tenía vigencia de dos años, W Construction se obligó a proveer servicios de recogido de escombros, limpieza y disposición en el Municipio de Aguada (Municipio). El Municipio, por su parte, se comprometió a pagar dentro de treinta (30) días laborables a partir de los reembolsos recibidos por FEMA.

Varios meses después, W Construction solicitó una enmienda a la cuantía del contrato por ser necesario para finalizar los trabajos, conforme a los estimados de gastos solicitados por la Directora de Finanzas del Municipio. Con la anuencia de la Junta de Subastas, el 28 de marzo de 2019 se perfeccionó la enmienda al convenio y se aumentó el monto por $4,000,000, para una compensación total de $7,000,000. Contrato Núm. 2019-000159-A.

Para sufragar los servicios de recogido y disposición de escombros, el 5 de marzo de 2019 W Construction otorgó un contrato de préstamo con la empresa Recovery Finance Limited

(Recovery Finance) mediante el cual se le facilitó una línea de crédito de hasta $5,000,000. En armonía, también se pactó un contrato de garantía en el que W Construction le otorgó a Recovery Finance un gravamen continuo sobre todos sus derechos, títulos e intereses bajo el Contrato de Servicios con el Municipio, en resguardo de sus obligaciones de repago. W Construction le notificó al Municipio al respecto y este firmó la notificación como recibida.

Según surge del expediente, W Construction realizó las labores acordadas en el Contrato de Servicios y su enmienda dentro del término establecido de dos años. Por esta razón sometió las facturas al Municipio, tal y como lo establecía el acuerdo, para cobrar por servicios prestados. En respuesta, el Municipio remitió las facturas a la Oficina Central de Recuperación, Reconstrucción y Resiliencia (COR3) y a FEMA para el desembolso correspondiente. Una vez sometidas las facturas, tanto COR3 como FEMA aprobaron el desembolso de fondos para su pago. A la fecha, FEMA le ha abonado al Municipio $4,669,894.33 por los servicios suministrados y el Municipio ha efectuado pagos a W Construction por la cantidad de $624,304.82. No obstante, el Municipio se negó a pagar el remanente de la suma acordada, pues alega que el proceso de contratación fue nulo porque no se cumplieron los trámites requeridos por ley.

En sintonía, es importante señalar que el 5 de agosto de 2019 el Lcdo. Christian E. Cortés Feliciano radicó una querella ante el Departamento de Justicia para que se

investigara un posible esquema de corrupción gubernamental en los procesos de contratación y enmienda discutidos. A raíz de la denuncia instada por el entonces legislador municipal, quien actualmente es el alcalde de Aguada, el Departamento de Justicia remitió al Panel sobre el Fiscal Especial Independiente (PFEI) su informe de investigación preliminar. Por su parte, el Departamento no encontró evidencia que constituyera delito o presión indebida por el exalcalde, Manuel Santiago Mendoza, en la otorgación del contrato a W Construction. Por esta razón la querella no originó acusación alguna por parte del aparato gubernamental. No obstante, el Departamento de Justicia concluyó que el contrato era nulo debido a que la corporación no cumplió con el requisito de dos años de experiencia en operación logística para la recuperación del desastre expuesto en el edicto para cualificar como licitante.

El 3 de septiembre de 2020, el PFEI emitió una resolución en la que concurrió con las determinaciones del Departamento de Justicia. Dicha resolución fue remitida a la Unidad de Procesamiento Administrativo Disciplinario (UPAD) para su evaluación y recomendación. El 3 de marzo de 2021, UPAD también concurrió con que no se cumplió el requisito de dos años de experiencia.

Bajo este panorama, el 11 de noviembre de 2021 el Municipio instó ante el Tribunal de Primera Instancia una acción civil sobre sentencia declaratoria, a tenor con lo dispuesto por la Regla 59 de Procedimiento Civil, 32 LPRA

Ap. V., en contra de W Construction. En síntesis, el Municipio alegó que el contrato de servicios y la enmienda eran nulos porque, al momento de someter su propuesta, W Construction no cumplía con el requisito establecido en la solicitud de propuesta que exigía que las compañías participantes tuvieran dos años de experiencia en el campo de recuperación de desastres y recogido de escombros. Para sostener su postura, acompañó un certificado emitido por el Departamento de Estado en donde se refleja que la compañía fue organizada el 30 de agosto de 2017. En la alternativa, solicitó que se declarara nula la enmienda al contrato, pues la Ley de Municipios Autónomos de Puerto Rico, infra, no permite un aumento de más de 30% de la cuantía del contrato original sin la celebración de una nueva subasta.

Luego de varios trámites procesales, el 15 de diciembre de 2021 Recovery Finance presentó una moción de intervención. Alegó tener interés significativo en la controversia, pues se había convertido en el beneficiario principal de los activos provenientes del contrato en cuestión. El 17 de febrero de 2022 el foro primario celebró la vista en su fondo y, ese mismo día, concedió la solicitud de intervención en corte abierta.

Durante la vista en su fondo, el Municipio presentó prueba documental y testifical. La prueba testifical consistió únicamente en el testimonio de la Sra. Zulema Bravo Pérez (señora Bravo Pérez), secretaria municipal del pueblo de Aguada. Su testimonio se trajo para propósitos de

autenticación de documentos y contenido. La prueba documental presentada por el Municipio y admitida consistió en: (1) Copia del Contrato Núm. 2019-000159; (2) Enmienda al contrato (Contrato Núm. 2019-000159-A); (3) Registro de la corporación; (4) Certificado de cumplimiento (Good Standing); (5) Ordenanza Núm. 5; (6) Reglamento de la Junta de Subasta 2011, y (7) Aviso de solicitud de propuesta (Contrato a término para servicios de respuesta a desastres).

En su testimonio, la señora Bravo Pérez declaró que comenzó a trabajar en el Municipio el 6 de diciembre de 2021, esto es, luego de la otorgación del Contrato de Servicios y su enmienda. Más aún, admitió que comenzó a fungir como secretaria de la Junta de Subastas durante el 2022. Con relación a los deberes de su puesto, afirmó que consistían en verificar todas las subastas que se efectúan; así como tener la custodia de los expedientes y de los contratos del Municipio.

Respecto al trámite que aquí nos ocupa, la señora Bravo Pérez indicó que lo único que pudo hacer fue verificar el expediente del Contrato de Servicios, su enmienda, y fotocopiar los documentos. Por tanto, admitió que no preparó el acuerdo, no lo firmó, ni trabajó para el presidente o para el secretario municipal durante el año fiscal en el que se otorgó el Contrato de Servicios y la enmienda (2018-2019). Sin embargo, la secretaria municipal sí aseveró que W Construction no cumplió con el requisito de experiencia de

dos años exigido en la solicitud de propuestas. Afirmó que ella no hubiese votado por tal corporación como licitador agraciado. Asimismo, sostuvo que W Construction tampoco cumplió con los requisitos de tener conocimiento y experiencia en los procesos de reembolso de asistencia pública de FEMA y de proveer servicios similares en poblaciones de más de diez mil (10,000) habitantes.

Durante el contrainterrogatorio, la señora Bravo Pérez reconoció que, en cuanto a los años de experiencia de un licitador, se suele evaluar la experiencia del presidente y de los constructores de una corporación. Pese a esto, reafirmó que, para esta subasta, los dos años de experiencia debían ser de la compañía que interese licitar, por lo que W Construction no tenía la experiencia necesaria. La testigo aceptó que los trabajos de recogido de escombros y limpieza se culminaron. También admitió que el expediente presentado ante el Tribunal de Primera Instancia no estaba completo. Finalmente, indicó que en el expediente no había solicitudes de revisión judicial por parte de algún licitador.

Por su parte, W Construction presentó el testimonio de su presidente, el Sr. Wilson Matos Ruiz (señor Matos Ruiz). En su declaración, afirmó que ha sido contratista por más de 17 años y que su experiencia abarcaba la realización de demoliciones, desganches, recogido de material vegetativo, cemento, disposición, construcción industrial, comercial y residencial, cortes de terreno y operación de maquinarias.

En torno a la experiencia en trabajos de emergencia bajo FEMA, el señor Matos Ruiz resaltó que, al suscribirse el acuerdo con el Municipio, ya había limpiado las carreteras de Arecibo hasta Guayanilla. Por lo cual, a su entender, cumplió automáticamente con el requisito de haber brindado servicios similares a más de 10,000 habitantes. Agregó que, en ese momento, ya había limpiado la Carretera 109 de Añasco, desde el kilómetro 17 hasta San Sebastián; así como los parques del Departamento de Recursos Naturales y la playa *Crash Boat* en Aguadilla. Incluso, testificó que FEMA lo recomendó para limpiar el Hospital Bella Vista y así lo hizo.

Por otro lado, sobre la enmienda al Contrato de Servicios, explicó que en los contratos de emergencia no se puede determinar de antemano un precio exacto debido a que se desconoce lo que se va a recoger. Ante esta situación, explicó que tuvo que ir personalmente a las facilidades provisionales de FEMA y COR3 en Aguadilla y solicitar la mejora, pues la suma pactada no alcanzaba para culminar los trabajos. Tras un análisis de costos adicionales, se acordó un aumento de cuatro millones adicionales, aunque aclaró que no se utilizaron en su totalidad.

El señor Matos Ruiz estimó en $6,100,000 la deuda por las labores realizadas. En vista de que obtuvo financiamiento con Recovery Finance para poder culminar los trabajos, aseveró que la suma reclamada por los trabajos de recogido de escombros y limpieza le pertenecen en su totalidad a la financiera. Por último, indicó que los

trabajos para los que fue contratado se realizaron y que los monitores de FEMA así lo certificaron.

Finalizados los testimonios y tras la celebración de la vista, el Municipio dio por sometido su caso. Con ello, prácticamente se amparó en el testimonio de la señora Bravo Pérez y en la prueba documental admitida para sostener su causa de acción.

En riposta, W Construction y Recovery Finance solicitaron la desestimación del reclamo. Como parte de su argumento, Recovery Finance afirmó que la demanda del Municipio debía ser desestimada por dos razones: (1) el Tribunal de Primera Instancia carecía de jurisdicción para atender la controversia, pues la alegada nulidad del contrato basada en supuestos errores cometidos por la Junta de Subastas en la adjudicación de la propuesta era de jurisdicción exclusiva del Tribunal de Apelaciones, y (2) la evidencia sometida por el Municipio no fue suficiente para probar la nulidad del Contrato de Servicios puesto que el Municipio no presentó el expediente administrativo en su totalidad, el cual se presume correcto.

Además, Recovery Finance alegó que el presidente de W Construction, señor Matos Ruiz, contaba con experiencia en el ámbito de recuperación de desastres y eliminación de escombros que excedía el requerimiento de dos años estipulado en la solicitud de propuestas. Asimismo, en cuanto a la alegación relacionada con la enmienda al contrato, aseveró que, por tratarse de un contrato de

servicios de emergencia, el Municipio no estaba obligado a celebrar una subasta aun cuando el monto de la enmienda excediera el 30% del contrato original. Sostuvo que el Municipio ratificó el contrato y su correspondiente enmienda toda vez que recibió los servicios, supervisó que los trabajos se completaran satisfactoriamente, remitió las facturas a FEMA y recibió pagos por parte de FEMA con relación a los servicios prestados.

Tras la comparecencia de las partes, el 18 de agosto de 2022 el Tribunal de Primera Instancia declaró ha lugar la sentencia declaratoria presentada por el Municipio de Aguada. Decretó que el Contrato de Servicios y su enmienda eran nulos por "no haberse cumplido con los requisitos ordinarios de la subasta pública ni con los requisitos establecidos en situaciones excepcionales, como las de una emergencia, dispuestos en la Ley Núm. 81-1991, supra, (derogada) y el Reglamento de la Junta de Subastas del Municipio de Aguada, aprobado el 6 de septiembre de 2011". Ap. del certiorari, pág. 337. Entre otras cosas, el Tribunal de Primera Instancia entendió que W Construction no cumplió con el requisito de dos años de experiencia en recuperación de desastres y que la Junta de Subastas incumplió con su responsabilidad al otorgar una enmienda a dicho contrato por $4,000,000, lo que aumentó el costo del proyecto a $7,000,000, sin la celebración de una nueva subasta.

Inconformes, W Construction y Recovery Finance presentaron cada uno recursos apelativos ante el Tribunal de

Apelaciones. El 29 de septiembre de 2022, los recursos fueron consolidados. En definitiva, ambas partes argumentaron que el Tribunal de Primera Instancia carecía de jurisdicción para decretar la nulidad del Contrato de Servicios y su enmienda debido a que la adjudicación de la subasta ya advino final y firme y la causa de acción fue instada fuera del término establecido en la ley. Además, sostuvieron que, si bien W Construction no tenía para ese entonces dos años de creada, la compañía sí cumplió con el requisito de experiencia puesto que su presidente, el señor Matos Ruiz, era contratista desde hacía más de 17 años. Por otro lado, por tratarse de unos servicios de emergencia, arguyeron que la ley permite la suscripción de una enmienda sin la celebración de una nueva subasta o solicitud de propuestas. Recalcaron que el Municipio ratificó el Contrato de Servicios y su enmienda al recibir los servicios pactados y obtener los pagos de FEMA por dichos trabajos. Por esto y más, entendieron que el foro primario actuó de forma arbitraria y caprichosa al privarlos de su propiedad sin el debido proceso de ley.

Por su parte, el Municipio presentó su alegato en oposición el 12 de enero de 2023 a través del cual sostuvo la nulidad de la contratación por haber sido contraria al orden público.

Luego de varios incidentes procesales, el 21 de marzo de 2023, el Tribunal de Apelaciones emitió una *Sentencia* en la que confirmó el dictamen del Tribunal de Primera

Instancia. El foro apelativo se enfocó en el requisito de al menos dos años de experiencia y determinó que dicho criterio tenía que ser cumplido por la empresa proponente, y no por sus socios, oficiales o accionistas. Para llegar a esta conclusión, razonó que la normativa establecida en AEE v. Maxon, supra, no aplica en este caso, pues entendió que el Tribunal Supremo limitó esta pauta a situaciones en las que se van a adquirir servicios técnicos de gran costo y sofisticación. Por ende, sentenció que la actuación de pasar por alto este criterio de experiencia invalidó la adjudicación realizada y la hizo nula. Sobre la enmienda, el Tribunal manifestó que cualquier ajuste realizado a un contrato nulo no puede subsistir de manera independiente a este, por lo que también carece de eficacia jurídica.[1]

Oportunamente, W Construction y Recovery Finance solicitaron reconsideración ante el Tribunal de Apelaciones, pero fue declarada no ha lugar.

Insatisfechos, W Construction y Recovery Finance instaron ante este Tribunal recursos de *certiorari* por separado. En síntesis, solicitaron la revocación de la declaración de nulidad del Contrato de Servicios y su

---

[1] El Juez Sánchez Ramos emitió un voto disidente en el cual sostuvo que el foro primario abusó de su discreción pues consideró que no hay base en el récord que permita concluir que el contrato es nulo. Entendió que el Tribunal de Primera Instancia no tuvo ante sí prueba alguna de que se hubiese incumplido alguno de los requisitos de la subasta o solicitud de propuestas. En cuanto al requisito de dos años de experiencia, sostuvo que la norma establecida en AEE v. Maxon, supra, indica que las entidades públicas siempre pueden considerar la experiencia de los individuos asociados a una corporación al evaluar si una persona jurídica cumple algún requisito de experiencia. Para concluir, subrayó que el peso de la prueba para atacar la validez del contrato lo tenía el Municipio y este optó por no someter en evidencia el expediente administrativo en su totalidad.

enmienda. Manifestaron que el Tribunal de Apelaciones erró al convalidar una sentencia de instancia dictada sin jurisdicción. En la alternativa, sostuvieron que el foro apelativo se equivocó cuando modificó la norma establecida en AEE v. Maxon, supra, al pautar que, en los contratos de servicios, la evaluación de un licitador debe estar orientada en la ficción de que la experiencia de los empleados, oficiales y directores es un concepto separado y diferente de la experiencia de la compañía. Además, defendieron que constituye un error el considerar que la enmienda al Contrato de Servicios es nula porque no se otorgó tras la celebración de una nueva subasta. Ultimaron que la sentencia impugnada no tiene base fáctica ni jurídica en el récord, los priva de su propiedad sin el debido proceso de ley y constituye un abuso de discreción por parte de los foros inferiores.

Por el contrario, el Municipio compareció y se opuso a la expedición del *certiorari* en ambos. Esbozó que los errores señalados no se cometieron, que el Contrato de Servicios y su enmienda son nulos y, por ende, no pueden producir consecuencia jurídica alguna, pues W Construction no cumplió con el requisito de experiencia al momento de la adjudicación.

Tras ordenar la consolidación de los recursos de referencia, expedimos el auto de *certiorari*. Ahora, con el beneficio de la comparecencia de todas las partes, procedemos a resolver.

II

**A. *Aspectos jurisdiccionales***

En múltiples ocasiones hemos expresado que la jurisdicción es el poder o la autoridad que tiene un tribunal para considerar y decidir casos o controversias. Cobra Acquisitions, LLC v. Mun. de Yabucoa, 210 DPR 384, 394 (2022); Pueblo v. Rivera Ortiz, 209 DPR 402, 414 (2022); Pueblo v. Ríos Nieves, 209 DPR 264, 273 (2022). Para poder adjudicar un caso, el tribunal debe tener jurisdicción sobre la materia en controversia y sobre las partes litigiosas. Cobra Acquisitions, LLC v. Mun. de Yabucoa, supra, pág. 394; Shell v. Srio. Hacienda, 187 DPR 109, 122 (2012). Así, esta Curia ha reiterado que los tribunales debemos ser celosos guardianes de nuestra jurisdicción, por lo que los asuntos relacionados con esta son privilegiados y deben atenderse con prioridad. Ruiz Camilo v. Trafon Group, Inc., 200 DPR 254, 268 (2018); Horizon v. Jta. Revisora, RA Holdings, 191 DPR 228, 234 (2014). De un tribunal dictar una sentencia sin tener jurisdicción, su decreto será jurídicamente inexistente o ultra vires. Maldonado v. Junta de Planificación, 171 DPR 46, 55 (2007).

Por esta razón, el aspecto jurisdiccional debe ser el primer factor que los foros adjudicativos consideren ante toda situación jurídica que se presente ante sí, pues este incide directamente sobre el poder mismo para adjudicar una controversia. Torres Alvarado v. Madera Atiles, 202 DPR 495, 500 (2019); Ruiz Camilo v. Trafon Group, Inc., supra, pág.

268; <u>Horizon v. Jta. Revisora, RA Holdings</u>, <u>supra</u>, págs. 233-234. Esto comprende la responsabilidad indelegable de examinar su propia jurisdicción, así como la del foro de donde procede el recurso ante su consideración. <u>Torres Alvarado v. Madera Atiles</u>, <u>supra</u>, pág. 500; <u>S.L.G. Szendrey Ramos v. F. Castillo</u>, 169 DPR 873, 883 (2007).

En consecuencia, al cuestionarse la jurisdicción de un tribunal por alguna de las partes o, incluso, cuando no haya sido planteado por estas, dicho foro examinará y evaluará con rigurosidad el asunto jurisdiccional, y de determinar que no posee jurisdicción, solo resta así declararlo y desestimar la reclamación sin entrar en los méritos de la controversia. <u>Torres Alvarado v. Madera Atiles</u>, <u>supra</u>, pág. 501; <u>Ruiz Camilo v. Trafon Group, Inc.</u>, <u>supra</u>, pág. 269.

### B. *Ley de Municipios Autónomos*

La Ley de Municipios Autónomos de Puerto Rico (Ley de Municipios Autónomos), Ley Núm. 81-1991, según enmendada, 21 LPRA ant. sec. 4001 *et seq.*, confirió a los municipios un mayor grado de gobierno propio y autonomía fiscal.[2] Exposición de motivos de la Ley de Municipios Autónomos, <u>supra</u>, (derogada); véase, además, <u>Muñiz Burgos, Inc. v. Mun. Yauco</u>, 187 DPR 665, 675 (2013). La intención legislativa detrás de la aprobación del estatuto fue otorgarles a los municipios los poderes y facultades necesarios para asumir

---

[2] Aunque esta ley fue derogada por el recién aprobado "Código Municipal de Puerto Rico", Ley Núm. 107-2020, 21 LPRA sec. 7001 *et seq.*, las disposiciones de la Ley de Municipios Autónomos son las aplicables a este caso, por haber estado vigente al momento de los hechos.

un rol activo en su desarrollo urbano, social y económico. González Meléndez v. Municipio Autónomo de San Juan, 2023 TSPR 95, 212 DPR _ (2023). El Artículo 1.006 de la Ley de Municipios Autónomos, supra, 21 LPRA sec. 4004 (derogada), establecía que los municipios gozan de autonomía en el orden jurídico, económico y administrativo. Esta autonomía comprende, entre otras cosas, la libertad para administrar sus bienes y disponer de sus ingresos, lo que incluye la capacidad para contratar servicios. Art. 2.001 de la Ley de Municipios Autónomos, supra, 21 LPRA sec. 4051 (derogada).

Con relación a la revisión judicial de las adjudicaciones de la Junta de Subastas, la Ley de Municipios Autónomos en su Art. 15.002, 21 LPRA sec. 4702 (derogado), establecía:

> (1) El Tribunal de Primera Instancia de Puerto Rico entenderá y resolverá con exclusividad, **a instancias de la parte perjudicada**, sobre los siguientes asuntos:
> (a) Revisar cualquier acto legislativo o administrativo de cualquier funcionario u organismo municipal que lesione derechos constitucionales de los querellantes o que sea contrario a las leyes de Puerto Rico.
> (b) Suspender la ejecución de cualquier ordenanza, resolución, acuerdo u orden de la legislatura, del alcalde o de cualquier funcionario del municipio que lesione derechos garantizados por la Constitución del Estado Libre Asociado de Puerto Rico o por las leyes estatales.
> (c) […]
> (d) […]
>
> En los casos contemplados bajo las cláusulas (a) y (b) de este inciso, la acción judicial sólo podrá instarse dentro de los veinte (20) días siguientes a la fecha en que el acto legislativo o administrativo se haya realizado o que la ordenanza, resolución, acuerdo u orden se haya notificado por el alcalde o funcionario municipal

autorizado a la parte querellante por escrito mediante copia y por correo regular y certificado a menos que se disponga otra cosa por ley. Disponiéndose, que el término de veinte (20) días establecido en esta sección comenzará a decursar a partir del depósito en el correo de dicha notificación; y que la misma deberá incluir, pero sin ser limitativo, el derecho de la parte afectada a recurrir al Tribunal de Primera Instancia, Sala Superior competente; término para apelar la decisión; fecha del archivo en auto de la copia de la notificación y a partir de [qué] fecha comenzará a transcurrir el término.

(2) El Tribunal de Apelaciones revisará, con exclusividad, el acuerdo final o adjudicación de la Junta de Subastas, el cual se notificará por escrito y mediante copia por correo escrito regular y certificado **a la(s) parte(s) afectada(s)**. La solicitud de revisión se instará dentro del término jurisdiccional de diez (10) días contados desde el depósito en el correo de la copia de la notificación del acuerdo final o adjudicación. La notificación deberá incluir el derecho de la(s) parte(s) afectada(s) de acudir ante el Tribunal de Apelaciones para la revisión judicial; término para apelar la decisión; fecha de archivo en auto de la copia de la notificación y a partir de qué fecha comenzará a transcurrir el término. La competencia territorial será del circuito regional correspondiente a la región judicial a la que pertenece el municipio. (Negrillas suplidas).

Como vemos, el Art. 15.002 de la Ley de Municipios Autónomos, <u>supra</u>, establecía dos términos distintos para revisar las actuaciones municipales ante los foros judiciales del país. El primero de ellos, de veinte (20) días, se dividía en dos incisos. El inciso (a) se activaba cuando una **parte perjudicada** cuestionaba una determinación final de un funcionario municipal que lesionare sus derechos constitucionales o que fuere contraria a las leyes de Puerto Rico. <u>Nogama Constr. Corp. v. Municipio de Aibonito</u>, 136 DPR 146, 152 (1994). Por su parte, el inciso (b) aplicaba cuando

una **parte perjudicada** pretendía evitar que se pusiera en vigor una ordenanza municipal que fuera contraria a las leyes o a la Constitución. Íd., pág. 153.

Por otro lado, el segundo término establecido por el Art. 15.002 de la Ley de Municipios Autónomos, supra, indicaba que **las parte(s) afectada(s)** por adjudicaciones de la Junta de Subastas de cada municipio podían revisar tales determinaciones ante el Tribunal de Apelaciones. Para esto debían presentar una solicitud de revisión dentro del término jurisdiccional de diez (10) días contados desde el archivo en autos de la copia de la notificación del acuerdo final o adjudicación. Véase, Puerto Rico Eco Park, Inc. v. Municipio de Yauco (Junta de Subastas), 202 DPR 525, 535-536 (2019); IM Winner, Inc. v. Junta de Subastas del Gobierno Mun. de Guayanilla, 151 DPR 30, 34-35 (2000).

De esta forma, la Ley de Municipios Autónomos estableció términos de caducidad para que **las partes afectadas** pudieran impugnar cualquier ordenanza, resolución o acuerdo de la Legislatura Municipal o de cualquier funcionario del municipio, ante el Tribunal de Primera Instancia. Véase, Mun. de Peñuelas v. Ecosystems, Inc., 197 DPR 5, 28 (2016).

Valiéndose de estos términos, los peticionarios alegan que no tenemos jurisdicción, pues la adjudicación del contrato ocurrió hace algunos años. No obstante, al ponderar este señalamiento a la luz de la jurisprudencia aquí expuesta, sin lugar a duda, el Tribunal tiene potestad para resolver la controversia. Aquí no estamos ante una típica

impugnación de la adjudicación de subastas que debe ser revisada conforme el Art. 15.002(2) de la Ley Núm. 81-1991, supra, pues en la práctica, el legislador dispuso este término para que los **licitadores no favorecidos** en una subasta pudieran acudir ante el Tribunal de Apelaciones a presentar el reclamo que entiendan pertinente. Tampoco estamos frente a una parte perjudicada que, al amparo del Art. 15.002(1) de la Ley Núm. 81-1991, Íd., intenta evitar que se ponga en vigor una ordenanza municipal que lesione sus derechos legales o constitucionales. En realidad, la presente situación es muy particular pues trata sobre un municipio que cuestiona una actuación municipal propia por considerarla nula y contraria a las leyes de Puerto Rico. Por esta razón, los términos jurisdiccionales establecidos en el Art. 15.002 de la Ley de Municipios Autónomos no aplican a los hechos de este caso.

C. *Contratación gubernamental*

En Puerto Rico, la contratación gubernamental de servicios está revestida del más alto interés público, pues persigue fomentar la inversión adecuada, responsable y eficiente de los recursos del Estado. St. James Security v. AEE, 2023 TSPR 149, 212 DPR __ (2023); SLG Ortiz-Mateo v. ELA, 2023 TSPR 43, 211 DPR __ (2023); ECA Gen. Contrac. v. Mun. de Mayagüez, 200 DPR 665, 672 (2018). Por lo tanto, las normas reconocidas sobre los contratos han de aplicarse rigurosamente, pues persiguen el fin de proteger los intereses y dinero del pueblo. SLG Ortiz-Mateo v. ELA,

supra; Demeter Int'l v. Srio. Hacienda, 199 DPR 706, 729 (2018). Así, en Ocasio v. Alcalde Mun. de Maunabo, 121 DPR 37, 54 (1988), enumeramos por primera vez los requisitos que todo contrato gubernamental debe cumplir. Estos son: (1) reducirse a escrito; (2) mantener un registro que establezca su existencia; (3) remitir copia a la Oficina del Contralor de Puerto Rico, y (4) acreditar que se realizó y otorgó quince días antes. Véanse, además: SLG Ortiz-Mateo v. ELA, supra; Génesis Security v. Depto. Trabajo, 204 DPR 986, 998 (2020); ALCO Corp. v. Mun. de Toa Alta, 183 DPR 530, 537 (2011).

D. *El Procedimiento de Subasta o Solicitud de Propuestas*

Con el fin de alcanzar la más responsable, eficiente y adecuada inversión de los recursos del Estado, los gobiernos municipales y el central utilizan los procedimientos de subasta o *Request for proposals* (RFP) como métodos para adquirir bienes y servicios. St. James Security v. AEE, supra; Puerto Rico Eco Park, Inc. v. Municipio de Yauco (Junta de Subastas), supra, pág. 531. A través de ambos mecanismos se protegen los intereses del Pueblo, ya que procuran conseguir "los precios más económicos; evitar el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia y el descuido al otorgarse los contratos, y minimizar los riesgos de incumplimiento". Caribbean Communications v. Pol. de P.R., 176 DPR 978, 994 (2009). Por ello, cualquier controversia que se derive de los

procedimientos de subasta deben decidirse a la luz del interés público. St. James Security v. AEE, supra; Caribbean Communications v. Pol. De P.R., supra, pág. 1006.

El proceso de subasta formal constituye el vehículo procesal más utilizado por el Estado en la adquisición de bienes y servicios. ECA Gen. Contrac. v. Mun. de Mayagüez, supra, pág. 672; R & B Power v. E.L.A., 170 DPR 606, 620 (2007). De ordinario, el procedimiento de subasta pública formal consta de varias etapas, a saber: (1) la preparación de los pliegos de condiciones y especificaciones; (2) la publicación del aviso de subasta; (3) el recibo de las propuestas selladas y su posterior apertura pública; (4) la evaluación y el estudio de las propuestas por el comité evaluador de la agencia; (5) la recomendación del comité respecto a la adjudicación de la buena pro; (6) la adjudicación de la subasta, y (7) la notificación a los licitadores. Íd., pág. 621. Una vez sometida la propuesta, el proceso de subasta formal no admite ningún tipo de negociación entre la agencia y el licitador. ECA Gen. Contrac. v. Mun. de Mayagüez, supra, pág. 673.

En cambio, el RFP se destaca por ser un procedimiento informal y flexible que permite la negociación entre el oferente y el gobierno, en el que se pueden enmendar las ofertas antes de la adjudicación del contrato. Puerto Rico Eco Park, Inc. v. Municipio de Yauco (Junta de Subastas), supra, págs. 531-532. En comparación con la subasta tradicional, el RFP confiere a la entidad pública un mayor

grado de discreción a la hora de considerar una propuesta. R & B Power v. E.L.A., supra, pág. 623. El uso de este método es común cuando el ente gubernamental intenta adquirir bienes o servicios que involucran aspectos altamente complejos o cuando existen escasos competidores cualificados. Íd. Todo requerimiento de propuestas debe contener los requisitos, términos y condiciones, y demás factores que según la agencia se considerarán en la evaluación de las propuestas de cara a adjudicar el contrato en cuestión, a los cuales cada licitador tendrá que responder. ECA Gen. Contrac. v. Mun. de Mayagüez, supra, pág. 674. El RFP debe describir cómo se llevará a cabo el proceso, incluso el itinerario para recibir, evaluar y adjudicar la buena pro, lo cual facilita la negociación entre la entidad gubernamental y el oferente. Íd., págs. 674-675; R & B Power v. E.L.A., supra, pág. 622.

Si bien la subasta formal y el RFP son procesos distintos, no son totalmente incompatibles entre sí. Puerto Rico Eco Park, Inc. v. Municipio de Yauco (Junta de Subastas), supra, pág. 532; Caribbean Communications v. Pol. de P.R., supra, pág. 998. Así pues, en el pasado hemos reconocido que un RFP "participa de características adjudicativas de la misma forma que la subasta tradicional". Puerto Rico Eco Park, Inc. v. Municipio de Yauco (Junta de Subastas), supra, pág. 532, citando a R & B Power v. E.L.A., supra, pág. 624. Por ello, un RFP no está exento de revisión

judicial y sus participantes pueden cuestionar la adjudicación de una propuesta. Íd.

No obstante, este Tribunal ha sentenciado en varias ocasiones que son las agencias administrativas quienes, de ordinario, se encuentran en mejor posición para evaluar las propuestas o licitaciones ante su consideración, de acuerdo con los parámetros establecidos por la ley y los reglamentos aplicables. St. James Security v. AEE, supra; CD Builders v. Mun. Las Piedras, supra, pág. 348. Por su pericia, se reconoce a las agencias discreción al momento de considerar, rechazar y adjudicar las subastas a favor de la propuesta que mejor responde a las necesidades del gobierno y al interés del pueblo en general. Íd. La selección de un proveedor sobre otros puede conllevar decisiones que descansen no solo en criterios estrictamente matemáticos sino en una valoración de la tecnología y los recursos humanos con que cuenta, a la luz de las necesidades presentes y futuras de la agencia. AEE v. Maxon, supra, pág. 439. Por esta razón, los tribunales no debemos intervenir con la adjudicación de una subasta, o el rechazo de una propuesta, salvo que la determinación administrativa adolezca de un abuso de discreción, arbitrariedad o irracionabilidad. CD Builders v. Mun. Las Piedras, supra, pág. 348.

Como norma general, en Puerto Rico no existe legislación que regule con uniformidad los procedimientos de subasta formal o de RFP. Por el contrario, la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAU),

Ley Núm. 38-2017, según enmendada, 3 LPRA sec. 9601 *et seq.*, permite que cada agencia gubernamental apruebe un reglamento para establecer el procedimiento y las guías que se han de seguir en sus propias subastas. Puerto Rico Eco Park, Inc. v. Municipio de Yauco (Junta de Subastas), supra, pág. 533.

No obstante, la LPAU expresamente excluye a los municipios de la definición de "agencia", por lo que a estos no le aplica la antedicha legislación. Sec. 1.3(5) de la Ley Núm. 38-2017, 3 LPRA sec. 9603. En consecuencia, las subastas tradicionales y los RFP están regulados por la Ley de Municipios Autónomos, supra, y el Reglamento para la Administración Municipal de 2016 de la Oficina del Comisionado de Asuntos Municipales, Reglamento Núm. 8873 de 19 de diciembre de 2016 (Reglamento Núm. 8873). Puerto Rico Eco Park, Inc. v. Municipio de Yauco (Junta de Subastas), supra, págs. 533-534.

**E. *Junta de Subastas Municipales***

La Ley de Municipios Autónomos y el Reglamento Núm. 8873 concedieron facultad a las Juntas de Subastas municipales, como organismos encargados de dichos procesos, para adjudicar subastas en consideración a la habilidad, responsabilidad económica, reputación e integridad comercial del licitador, así como el cumplimiento con las especificaciones, los términos de entrega y cualesquiera otras condiciones que se hayan incluido en el aviso de subasta. Véase, Art. 10.006 de la Ley de Municipios

Autónomos, supra, 21 LPRA sec. 4506 (derogada); Capítulo VIII, Parte II del Reglamento Núm. 8873, supra.

Para que las mencionadas juntas pudieran cumplir cabalmente con esta encomienda, cada municipio tenía que establecer un reglamento en el que se indique el procedimiento y las guías a seguir en sus propias subastas a tenor con la legislación aplicable. Art. 10.0001 de la Ley de Municipios Autónomos, supra, 21 LPRA sec. 4501 (derogada). En el caso ante nos, el Municipio de Aguada aprobó su Reglamento de la Junta de Subastas mediante la Ordenanza Núm. 5, Serie 2011-2012, el 6 de septiembre de 2011, firmado por el Alcalde el 13 de septiembre de 2011.

Sobre lo antedicho, tanto la Ley de Municipios Autónomos, como el Reglamento Núm. 8873 y el Reglamento de la Junta de Subastas de Aguada, coinciden en que las subastas, o los RFP, se adjudicarán a favor de la propuesta que cumpla con las especificaciones. Por ejemplo, al establecer los parámetros que deberán seguir las juntas de subastas para adjudicar la buena pro, el Art. X del Reglamento de la Junta de Subastas de Aguada, supra, indica que hay que brindar gran consideración, entre otros factores, a que la propuesta sea conforme a las especificaciones. A su vez, en el Capítulo VIII, Parte II, sec. 11 del Reglamento Núm. 8873, supra, se prescribe que la adjudicación se efectuará a favor del licitador que cumpla con los requisitos y condiciones de los pliegos de especificaciones. Véase, además, Art. 10.006 de la Ley de

Municipios Autónomos, supra, 21 LPRA sec. 4506. Así, podemos concluir que si la junta de subastas adjudica la subasta a favor de una propuesta que no cumple con los requisitos establecidos en el aviso publicado, violaría el orden público estipulado.

   F. *AEE v. Maxon*

   En AEE v. Maxon, supra, tuvimos la oportunidad de considerar si la compañía que obtuvo la buena pro de una subasta satisfizo las especificaciones, los términos y las condiciones requeridas en el aviso publicado. Específicamente, evaluamos si se cumplió con el requisito de **experiencia** establecido por la Autoridad de Energía Eléctrica (AEE) en los pliegos de subasta.

   De forma similar a como aquí sostiene el Municipio, Maxon Engineering Services, Inc. (Maxon) —licitador no agraciado— argumentó que la cláusula de experiencia no se refiere a la capacidad individual de los empleados del proveedor, sino a la de la compañía y sus ejecutorias. En sintonía, el Juez Administrativo que tuvo ante sí la controversia entendió que como la compañía agraciada no había realizado trabajos de ese tipo anteriormente, no cumplía con el requisito de experiencia. Íd., págs. 438-439. Consignó que el requerimiento de experiencia no se cumple al demostrar la capacidad individual de los empleados del proveedor para desarrollar el servicio solicitado. Íd. A su juicio, se requiere estrictamente que la compañía proveedora del servicio haya realizado tareas similares a las que se

solicitaban en el pliego de subasta. Por esto, anuló la determinación del Comité Permanente de Subasta de la AEE y adjudicó la subasta a favor de Maxon. Tal dictamen fue confirmado posteriormente por el foro apelativo intermedio. Íd.

Al enfrentar la controversia, **entendimos que la determinación de descartar la experiencia de los empleados como factor de cumplimiento de los requisitos establecidos por el pliego de subastas es contraria a derecho**. Íd., pág. 442. Por esta razón, se revocó la decisión del Tribunal de Apelaciones y la del Juez Administrativo. En ese momento, señalamos una gran variedad de artículos que consideran que **es necesario** que las agencias tomen en consideración la experiencia de empleados, socios, directores y hasta subcontratistas del proveedor al evaluar el requisito de experiencia establecido en los pliegos de subasta de un contrato de servicios. Íd.; véanse, 1B *McBride & Touhey, Government Contracts: Cyclopedic Guide to Law, Administration, Procedure* Sec. 10.230[5] (2004); D.P. Arnavas, *Government Contract Guidebook*, 3ra ed., Ed. West Group, 2001, pág. 6-23; American Bar Association, *Government Contract Law: The Deskbook for Procurement Professionals*, ABA Section of Public Contract Law, 1995, pág. 61.

Por su pertinencia al tema, citamos parte de nuestras expresiones en AEE v. Maxon:

> Ciertamente, en los *contratos de servicios*, la evaluación de un licitador **no debe estar orientada en la ficción de que la experiencia de los empleados es un concepto separado o diferente de**

> **la experiencia de la compañía.** *Después de todo, las personas jurídicas, como lo serían en este caso los proveedores de servicios para la rehabilitación de calderas, **no pueden operar si no es a través de seres humanos que les asisten, y que son éstos en última instancia, y no aquéllas, los que pueden ejecutar acciones y acumular experiencia.*** Por ello **la necesidad de que en el momento en que se vaya a determinar si un licitador cumple con los criterios de experiencia previa se tomen en consideración las habilidades, los conocimientos, las destrezas y el adiestramiento de aquellos que la forman, entiéndase, sus recursos humanos.** […]. (Negrillas suplidas y escolio omitido). <u>AEE v. Maxon</u>, <u>supra</u>, pág. 443.

### G. *Compras excluidas de la celebración de una subasta o RFP*

En torno a la subasta pública, el Art. 10.001 de la Ley de Municipios Autónomos, <u>supra</u>, (derogada), disponía lo siguiente:

**Artículo 10.001. — Subasta pública - Norma general.**

> Excepto en los casos que expresamente se disponga otra cosa en esta Ley, el municipio cumplirá con el procedimiento de subasta pública, cuando se trate de:
>
> (a) Las compras de materiales, equipo, comestibles, medicinas y otros suministros de igual o similar naturaleza, uso o características que excedan de cien mil ($100,000) dólares.
> (b) Toda obra de construcción o mejora pública por contrato que exceda de doscientos mil ($200,000) dólares.
> (c) Cualquier venta de propiedad mueble e inmueble.

Sin embargo, el Art. 10.002 de la Ley de Municipios Autónomos, <u>Íd.</u>, 21 LPRA sec. 4502 (derogada), excluía del requisito de subasta en las situaciones siguientes:

**Artículo 10.002. — Compras Excluidas de Subasta Pública.**

No será necesario el anuncio y celebración de subasta para la compra de bienes muebles y servicios en los siguientes casos:

[…]

(c) Compra o adquisición de suministros o servicios **en cualquier caso de emergencia en que se requiera la entrega de los suministros, materiales, o la prestación de los servicios inmediatamente.** En estos casos se deberá dejar constancia escrita de los hechos o circunstancias de urgencia o emergencia por los que no se celebra la subasta.

Los casos de emergencia a los que se refiere este Artículo son aquéllos dispuestos en el Artículo 1.003 del inciso (ff) de esta ley, 21 LPRA sec. 4001(ff).

[…]

(g) Las alteraciones o adiciones que conllevan un aumento en el costo de hasta un máximo del treinta por ciento (30%) del total del proyecto original en cualquier construcción o mejora de obra pública realizada por contrato. Tales alteraciones o adiciones deberán cumplir con las disposiciones vigentes al respecto. Disponiéndose, que, **en circunstancias excepcionales debidamente justificadas y documentadas, el municipio podrá aprobar una orden de cambio que exceda el treinta por ciento (30%) del costo del proyecto original en cualquier construcción o mejora de obra pública mediante la formulación de un contrato supletorio.**

[…]. (Negrillas suplidas).

Afín a esto, el Capítulo VIII, Parte IV, sec. 1 del Reglamento Núm. 8873, <u>supra</u>, establece que cuando surja la necesidad de efectuar compras o adquirir servicios para atender casos de emergencia se podrá obviar el proceso formal de subasta.

En cuanto a cuáles sucesos se pueden considerar como una emergencia, ambos cuerpos reglamentarios reconocen que un desastre natural es un acontecimiento que puede activar los mencionados preceptos. Véase, Capítulo I, sec. 6(12) del Reglamento Núm. 8873, <u>Íd</u>. A manera de ejemplo, el Artículo

1.003 de la Ley de Municipios Autónomos, 21 LPRA sec. 4001

(derogada), definía emergencia del modo siguiente:

> (ff) "Emergencia" — Significará la situación, el suceso o la combinación de circunstancias que ocasione necesidades públicas inesperadas e imprevistas y requiera la acción inmediata del gobierno municipal, por estar en peligro la vida, la salud o la seguridad de los ciudadanos o por estar en peligro de suspenderse o afectarse el servicio público o la propiedad municipal y que no pueda cumplirse el procedimiento ordinario de compras y adquisiciones de bienes y servicios, con prontitud debido a la urgencia de la acción que debe tomarse. **La emergencia puede ser causada por un caso fortuito o de fuerza mayor como un desastre natural**, accidente catastrófico o cualquier otra situación o suceso que por razón de su ocurrencia inesperada e imprevista, impacto y magnitud ponga en inminente peligro la vida, salud, seguridad, tranquilidad o el bienestar de los ciudadanos, o se afecten en forma notoria los servicios a la comunidad, proyectos o programas municipales con fin público. (Negrillas suplidas).

A la luz de la normativa antes expuesta, pasemos ahora a resolver la controversia.

### III

En el recurso ante nuestra consideración, W Construction y Recovery Finance solicitaron la revocación de la declaración de nulidad del Contrato de Servicios y su enmienda. Arguyeron que el foro apelativo intermedio se equivocó al interpretar que la normativa que establecimos en AEE vs. Maxon, supra, aplica únicamente a situaciones en que se adquieran servicios técnicos de gran costo y sofisticación, por lo que no obliga a servicios como los aquí contratados por ser estos de recogido de escombros y disposición de material vegetativo. Les asiste la razón a los peticionarios.

En primer lugar, según establecimos en AEE vs. Maxon, supra, pág. 442, la determinación de descartar la experiencia del personal que compone una empresa de la evaluación del cumplimiento de dicha empresa con requisitos establecidos por el pliego de subastas **es contraria a derecho**. La realidad es que para que los municipios y las agencias gubernamentales puedan tomar la determinación más informada posible, **es necesario que consideren la experiencia de todo aquel relacionado con la ejecución del contrato de servicios**. Íd. Desde empleados de la corporación hasta su presidente, todos pueden ser considerados a la hora de tomar una determinación sobre si la compañía cumple o no con la experiencia requerida.

Hoy reafirmamos, como mencionamos en aquella ocasión, que la evaluación de un licitador no debe estar orientada en la ficción de que la experiencia de una compañía es independiente a la de sus integrantes. Íd., pág. 443. "*Después de todo, las personas jurídicas, como lo serían en este caso los proveedores de servicios para la rehabilitación de calderas, no pueden operar si no es a través de seres humanos que les asisten, y que son éstos en última instancia, y no aquéllas, los que pueden ejecutar acciones y acumular experiencia*". Íd.

Por consiguiente, el análisis que cada ente gubernamental debe realizar sobre el requisito de experiencia es mucho más abarcador que simplemente mirar si el tiempo que la empresa lleva organizada, según la

documentación ofrecida por el Departamento de Estado, es igual o mayor al requerido en la solicitud de propuestas. La realidad es que no es decisivo el tiempo de creada que tenga la compañía contratada, siempre y cuando las habilidades, los conocimientos, las destrezas, el adiestramiento y la pericia de los que la integran sobrepase las exigencias establecidas.

Como vemos, nada en esta teoría jurídica tan siquiera invita a pensar que esta norma aplica solamente cuando estamos ante la adquisición de servicios técnicos de gran costo y sofisticación. Si bien es cierto que en el caso de AEE vs. Maxon, supra, sí se intentaban adquirir servicios especializados para la rehabilitación de unas calderas, ello no limita el principio básico de que las corporaciones solo pueden operar a través de las personas que ejecutan las acciones y adquieren experiencia. Es más, en AEE vs. Maxon, supra, el tipo de servicio se mencionó meramente para ejemplificar que puede haber adjudicaciones —como en las que se evalúan labores técnicas de gran costo y sofisticación— en las que las agencias seleccionen un proveedor sobre otro, sin tener que sujetarse a criterios estrictamente matemáticos, como lo sería escoger siempre al que realice la obra al precio más bajo. Íd., pág. 439.

De esta manera, erró el Tribunal de Apelaciones cuando sentenció que "el Tribunal Supremo pautó dicha norma para situaciones como las allí consideradas (adquisición de servicios técnicos de gran costo y sofisticación)". Ap. del

certiorari, pág. 25. El raciocinio de que las personas jurídicas solo pueden operar a través de los seres humanos que las asisten, aplica para cualquier tipo de labor que se vaya a contratar, y no exclusivamente a las labores más meticulosas. Por eso, en el acto de determinar si un licitador cumple con los requisitos de experiencia previa, es necesario tomar en consideración las habilidades, conocimientos, destrezas y experiencia de las personas naturales que componen la corporación. AEE vs. Maxon, supra, pág. 443.

Dicho esto, toca evaluar si las personas naturales que componen a W Construction tenían o no los dos (2) años de experiencia exigidos. Tras considerar la totalidad del expediente, no encontramos base en el récord, fáctica o jurídica, que nos lleve a concluir que la Junta de Subastas abusó de su discreción al otorgarle al peticionario la buena pro de la propuesta. Según se desprende de la *Notificación de Adjudicación* entregada al señor Matos Ruiz, la Junta de Subastas entendió que W Construction **"cumplió con todos y cada uno de los requisitos establecidos"**. Ap. del certiorari, pág. 399. Además, la prueba incontrovertida ante el Tribunal de Primera Instancia demostró que el Presidente **poseía los años de experiencia requeridos (17 años) en recuperación de desastres y recogido de escombros**, que tenía el conocimiento en torno a los procedimientos de facturación y reembolso de FEMA y que había provisto servicios similares en lugares de población igual o mayor a 10,000 habitantes.

La realidad es que el Municipio no pudo demostrar incumplimiento alguno con los requisitos establecidos en el pliego de subastas. En cambio, la prueba que sí fue presentada y aceptada por todas las partes evidenció que los servicios bajo el Contrato de Servicios y la enmienda sí se rindieron a satisfacción del Municipio. No solo esto, también se demostró que FEMA aprobó las facturas correspondientes e, incluso, desembolsó más de $4 millones a las arcas municipales para el pago correspondiente.

Por otro lado, W Construction y Recovery Finance refutaron que la enmienda al Contrato de Servicios sea nula porque no se otorgó tras la celebración de una nueva subasta. Sostuvieron que, por tratarse de un contrato de servicios de emergencia, el Municipio no estaba obligado a celebrar una subasta aunque el monto a la enmienda excediera el 30% del contrato original.

Sobre este particular, si partiéramos de la premisa de que a un año del paso del huracán María por Puerto Rico —la catástrofe de más transcendencia en el último siglo— no estábamos ante una emergencia que excluyera del requisito de celebrar una subasta, comoquiera la ley le permitía al Municipio otorgar una enmienda mayor del 30% del contrato original "en circunstancias excepcionales debidamente justificadas y documentadas". Así lo reconocía entonces el Art. 10.002(g) de la Ley de Municipios Autónomos, supra, 21 LPRA sec. 4502(g) (derogada).

Al evaluar este asunto, nuevamente no hay base alguna en el récord que nos mueva a concluir que no estábamos ante circunstancias excepcionales debidamente justificadas y documentadas que justificaran el proceder de la Junta de Subastas. A todo esto, hay que sumarle lo altamente sospechoso que resulta el hecho de que, para sostener su postura, el Municipio no haya sometido ante la consideración del foro primario copia del expediente en su totalidad, en donde se pueda evaluar la propuesta presentada por W Construction o las razones que tuvo la Junta de Subastas para arribar a su dictamen, entre otras cosas.

Al contrario, la prueba incontrovertida demostró la necesidad de enmendar el Contrato de Servicios, razones que fueron reiteradas por la Junta de Subastas y por FEMA. Por ejemplo, el Presidente de W Construction declaró que la enmienda fue imperativa, pues en los contratos de emergencia es muy difícil precisar de antemano un precio exacto debido a que se desconoce el volumen de lo que se va a recoger. Por su parte, el Municipio admitió que los servicios eran inevitables y se suplieron satisfactoriamente.

En conclusión, se equivocó el foro apelativo intermedio al determinar que la Junta de Subastas abusó de su discreción al otorgar la buena pro a W Construction. El foro apelativo intermedio encontró que: (1) los servicios contratados no eran altamente técnicos; (2) en el aviso de subasta no se incluyó expresamente que la experiencia se evaluaría a través de los accionistas o empleados, y (3) del testimonio

de la señora Bravo Pérez —**quien carecía de conocimiento personal por haber comenzado a laborar en el Municipio años después a la otorgación del contrato**— surgió que "[l]os dos años debe ser de la compañía". Ap. del certiorari, pág. 28. Sin embargo, estas conclusiones no son pertinentes, pues, como vimos, descansan en la ficción de que la experiencia de una compañía es independiente a la de sus integrantes.[3]

Ante la ausencia de ilegalidad, irregularidades o evidencia de que se hubiese infringido alguna de las muchas disposiciones estatutarias especiales que reglamentan lo relacionado con la forma y contenido de los contratos públicos, tenemos que ser deferentes con la determinación que en su día emitió la Junta de Subastas del Municipio de Aguada. Recordemos que los tribunales no debemos intervenir con la adjudicación de una subasta, o el rechazo de una propuesta, salvo que la determinación adolezca de un abuso de discreción, arbitrariedad o irracionabilidad. CD Builders v. Mun. Las Piedras, supra, pág. 348.

IV

Por los fundamentos antes expuestos, se revoca el dictamen del Tribunal de Apelaciones que confirmó la

---

[3] Este dictamen está en sintonía con la Federal Acquisition Regulation (FAR), principal reglamento que utilizan las agencias ejecutivas estadounidenses para regir la adquisición de servicios por medio de fondos federales. Al evaluar el rendimiento pasado de las compañías, FAR establece:

> (iii) **The evaluation should take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition.** (Negrillas suplidas). 48 CFR sec. 15.305.

determinación del foro primario por medio de la cual se declaró que el Contrato de Servicios y su enmienda eran nulos. Por consiguiente, se declara sin lugar la demanda del Municipio de Aguada.

Se dictará Sentencia de conformidad.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Municipio de Aguada<br><br>Recurrido<br><br>v.<br><br>W Construction, LLC<br><br>Recurrido<br><br>Recovery Finance Limited<br><br>Peticionaria<br>_____<br><br>Municipio de Aguada<br><br>Recurrido<br><br>v.<br><br>W Construction, LLC<br><br>Peticionario<br><br>Recovery Finance Limited<br><br>Recurrido | CC-2023-0320<br>CC-2023-0322 |

SENTENCIA

En San Juan, Puerto Rico, a 21 de junio de 2024.

Por los fundamentos antes expuestos en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, se revoca el dictamen del Tribunal de Apelaciones que confirmó la determinación del foro primario por medio de la cual se declaró que el Contrato de Servicios y su enmienda eran nulos. Por consiguiente, se declara sin lugar la demanda del Municipio de Aguada.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Colón Pérez emitió una Opinión disidente. La Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Estrella Martínez no intervinieron.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Municipio de Aguada<br><br>    Recurrido<br><br>        v.<br><br>W. Construction, LLC<br><br>    Recurrido<br><br>Recovery Finance Limited<br><br>    Peticionaria<br>_____<br>Municipio de Aguada<br><br>    Recurrido<br><br>        v.<br><br>W. Construction, LLC<br><br>    Peticionario<br><br>Recovery Finance Limited<br><br>        Recurrido | CC-2023-0320<br>cons. con<br>CC-2023-0322 |

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 21 de junio de 2024.

Hace aproximadamente dos décadas atrás, en *A.E.E. v. Maxon*, 163 DPR 434 (2004), **en el contexto de la adquisición de ciertos servicios técnicos de gran costo y sofisticación por parte del gobierno de Puerto Rico**, correctamente determinamos que, -- bien sea en el proceso de subasta profesional para obtener los mismos o en el de requerimiento de propuestas o *Request for Proposal* (*RFP*) que a tales fines se celebre --, el requisito de experiencia, de la persona jurídica licitadora que participa en este tipo de proceso,

podía ser suplido por la experiencia, habilidades, conocimiento y destrezas de las personas que la conforman.

Hoy, una mayoría de mis compañeros y compañera de estrado, **en el contexto de un cuestionable contrato para el recogido de desperdicios sólidos**, y en lo que consideramos un proceder en extremo peligroso, deciden hacer extensiva la precitada norma a todo procedimiento de adjudicación de servicios que otorgue el gobierno de Puerto Rico. Las razones que, -- en derecho --, se esbozan para ello, no nos convencen.

Así pues, y por considerar que lo aquí resuelto atenta contra los principios más básicos de sana administración pública, -- toda vez que, una decisión como ésta, en las manos de personas inescrupulosas y malintencionadas, podría propiciar actos constitutivos de **corrupción** --, enérgicamente disentimos del curso de acción seguido por una mayoría del este Tribunal en el caso de marras. Veamos.

I.

Los hechos que dan margen al presente litigio no están en controversia. En esencia, como bien se señala en la *Opinión* que hoy emite este Tribunal, nos encontramos ante un caso en el cual está en disputa la validez de cierto contrato otorgado por el Municipio de Aguada a favor de W. Construction para el recogido de escombros generados por el paso del Huracán María.

En lo relacionado al referido contrato, el Municipio de Aguada presentó ante el Tribunal de Primera Instancia una acción civil sobre sentencia declaratoria. En ésta, solicitó que se declarase la nulidad del referido acuerdo, toda vez

que, a su entender, W. Construction no había cumplido con el mínimo de experiencia requerido para adjudicársele el mismo. W. Construction, por su parte, sostuvo que cumplía con dicho requisito, pues el presidente de la referida corporación alegadamente contaba con más de diecisiete (17) años de experiencia en el ámbito de recuperación de desastres y eliminación de escombros.

Tras varios incidentes procesales no necesarios aquí pormenorizar, y luego de evaluar cuidadosa y detenidamente las alegaciones de ambas partes, así como el estado de derecho vigente, el foro primario dictó *Sentencia.* Al así hacerlo, favoreció la posición del Municipio de Aguada. A juicio del Tribunal de Primera Instancia, el requisito de experiencia, necesario para poder adjudicar el contrato objeto de estudio en el presente caso, según contemplado en nuestro ordenamiento jurídico, debía ser cumplido por la empresa proponente de los servicios, y no por sus socios, oficiales o accionistas. Dicha determinación fue confirmada por el Tribunal de Apelaciones.

Inconforme con lo sentenciado por el foro apelativo intermedio, W. Construction acudió ante nos. Perfeccionada la causa de epígrafe, -- y, a nuestro parecer, en un proceder, a todas luces, erróneo --, una mayoría de mis compañeros y compañera de estrado revoca el dictamen del Tribunal de Apelaciones que había confirmado la determinación del foro primario. Esto, por entender que, en cualquier contrato de servicios que otorgue el gobierno de Puerto Rico, en lo

relacionado al criterio aquí en controversia, la evaluación no debe estar orientada en la "ficción" de que la experiencia de los empleados y directores es un concepto separado o diferente de la experiencia de la compañía.

Como ya mencionamos, del curso de acción seguido por una mayoría de este Tribunal en el día de hoy, enérgicamente disentimos. Explicamos, brevemente, el porqué de nuestra postura.

## II.

### A.

Como es sabido, en nuestra jurisdicción, la contratación pública o gubernamental, -- a saber, el procedimiento mediante el cual el gobierno y sus dependencias adquieren bienes, servicios u obras del sector privado, --,[1] es un asunto revestido del más alto interés público. *SLG Ortiz-Mateo v. ELA*, 211 DPR 772, 794 (2023); *Demeter Int'l v. Srio. Hacienda*, 199 DPR 706, 729 (2018); *C.F.S.E. v. Unión de Médicos*, 170 DPR 443, 452 (2007). Tal revestimiento de interés público sobre los procesos de contratación pública, los cuales comprenden una parte significativa de las transacciones del gobierno,[2] se debe, en gran medida, a que

---

[1] "Contratación pública", *Organización para la Cooperación y el Desarrollo Económico (OECD)*, disponible en https://www.oecd.org/gov/contratacion-publica/ (última visita, 7 de junio de 2024). La OECD es una organización internacional cuya misión es diseñar políticas que mejoren el bienestar económico, social y ambiental de los distintos países miembros, entre estos, los Estados Unidos.

[2] I. Masses Ferrer, J. J. Jiménez y R. A. Román Villalobos, *Evaluación de los procesos de contratación pública en Puerto Rico*, Sembrando Sentido 10 (septiembre 2022), disponible en https://drive.google.com/file/d/1fGUE ELh-M3ao0PV6otTGEwzHbJVRI9xx/view. Sembrando Sentido es una organización sin fines de lucro que tiene como misión desarrollar conocimientos y herramientas para transformar en colectivo las estructuras

estos involucran el uso de los fondos y bienes del Estado. *Íd.*

La subasta tradicional y el requerimiento de propuestas o RFP son los métodos mediante los cuales tanto el gobierno central, como el gobierno municipal, adquieren los bienes, servicios u obras a los que hemos hecho referencia. *PR Eco Park et al. v. Mun. de Yauco*, 202 DPR 525, 531 (2019); *R&B Power v. E.L.A.*, 170 DPR 606, 621 (2007). Ello pues, históricamente, se ha entendido que, a través de ambos mecanismos, se protegen los intereses del Estado, ya que los mismos procuran conseguir "los precios más económicos; evitar el favoritismo, **la corrupción**, el dispendio, la prevaricación, la extravagancia y el descuido al otorgarse los contratos, y minimizar los riesgos de incumplimiento". (Énfasis nuestro). *PR Eco Park et al. v. Mun. de Yauco*, *supra*, pág. 531; *Caribbean Communications* v. Pol. de P.R., 176 DPR 978, 994 (2009).

Aun así, y no empece a las medidas de control que traen consigo los procesos de subasta tradicional o de requerimiento de propuestas (*RFP*), estudiosos del tema de la contratación gubernamental han sostenido que ésta es una de las áreas con mayor riesgo de que puedan cometerse actos constitutivos de corrupción.[3] De hecho, estudios

---

gubernamentales, y lograr la distribución justa y equitativa de los recursos públicos en Puerto Rico.

[3] *Íd.* pág. 23. Véase también, *Guidebook on anti-corruption in public procurement and the management of public finances*, United Nations Office on Drugs and Crime (UNODC) 1 (2013), disponible en https://www.unodc.org/documents/corruption/Publications/2013/Guidebook_o n_anti-corruption_in_public_procurement_and_the_management_of_public_f inances.pdf.

internacionales estiman que un promedio de 10-15% del presupuesto reservado a esos fines, -- entiéndase, a la contratación gubernamental --, se pierde como resultado de la corrupción, el mal uso de recursos y la ineficiencia en estos procesos.[4] Puerto Rico no es la excepción a la tendencia.[5]

B.

Sabido es que nuestro País enfrenta un problema de corrupción sistemática.[6] No es necesario mencionar aquí la cantidad de controversias de la más abyecta corrupción que, lamentable y consistentemente, hemos enfrentado durante los pasados años.

**La gran mayoría de estos escándalos han surgido en el contexto de la contratación pública.[7] <u>Y, precisamente, algunos han involucrado personas jurídicas que, sin contar con la experiencia requerida, pero gozando de nebulosas redes de influencia, han sido contratadas por entes gubernamentales</u>. Dichos casos son solo el resultado de las grietas existentes**

---

[4] *Evaluación de los procesos de contratación pública*, *supra* esc. 2, pág. 10. Véase también, *Guidebook on anti-corruption*, *supra* esc. 3, pág. 1.

[5] *Evaluación de los procesos de contratación pública*, *supra* esc. 2, pág. 23.

[6] *Estudio de investigación: desafíos de la corrupción para la gobernanza y la economía*, Centro de Gobernanza Pública y Corporativa 3 (2022), disponible en https://gobernanzapr.org/wp-content/uploads/2022/09/Estudio-corrupcion-web.pdf. El Centro de Gobernanza Pública y Corporativa es una organización sin fines de lucro enfocada en la investigación y educación sobre asuntos de gobernanza pública y corporativa, con el propósito de contribuir al desarrollo de un mejor gobierno para Puerto Rico.

[7] M. E. Enchautegui, *Modalidades de la corrupción gubernamental: perspectivas de los empleados públicos*, Oficina del Contralor de Puerto Rico (OCPR) 1 (2010), disponible en https://www.ocpr.gov.pr/wp-content/uploads/2016/04/Las-Modalidades-de-la-Corrupcion-Gubernamental-Perspectivas-de-los-Empleados-Publicos-rev.-22-de-noviembre-2.pdf.

**en los procesos de contratación gubernamental de Puerto Rico;**
**procesos que, con la *Opinión* que hoy emite una mayoría de mis**
**compañeros y compañera de estrado, se continúan**
**flexibilizando, en vez de forteciendo.**

Sobre el particular, conviene destacar que hallazgos de estudios locales han arrojado que los procesos de contratación pública en el archipiélago, en efecto, sufren de serias debilidades. A modo de ejemplo, se ha encontrado que los referidos procesos adolecen de falta de planificación y de la ausencia de mecanismos para monitorear el cumplimiento y el desempeño de los contratistas.[8] También se han identificado problemáticas tales como la manipulación de los procedimientos con la finalidad de evitar la competencia,[9] y la contratación de entidades y/o individuos que no cuentan con las licencias, permisos o experiencia requeridas.[10]

**Así las cosas, somos del criterio que cualquier**
**normativa que este Tribunal pretenda establecer, relacionada**
**a la contratación pública o gubernamental, debe evaluarse con**
**extrema cautela y suma rigurosidad, y tomando en**
**consideración el impacto que ésta pueda tener sobre la sana**
**administración pública. Esa debe ser la brújula que guíe**
**nuestra función adjudicativa en este tipo de casos.**

---

[8] *Evaluación de los procesos de contratación pública*, *supra* esc. 2, pág. 13.

[9] I. Masses Ferrer, *Incumplimiento de normas en los procesos de contratación y compra pública*, Sembrando Sentido 16-18, (febrero 2021), disponible                                                          en https://drive.google.com/file/d/1AqfvfquQKugTvq6qdpGG17undn9R6Ais/view

[10] *Íd.* págs. 22-23.

III.

En ese sentido, y tomando en cuenta lo antes dicho, somos de la opinión que la norma establecida, hace ya varias décadas atrás, en *AEE v. Maxon*, *supra*, es apropiada e incluso beneficiosa solo en aquellos escenarios en los que las entidades gubernamentales adquieren servicios de gran costo, tecnicidad y sofisticación. Esto, pues, por el grado de especificidad requerida en tales escenarios, podría ser complejo encontrar personas jurídicas licitadoras que cumplan, de forma directa, con el requisito de experiencia en cuestión.

**Ahora bien, extrapolar la normativa establecida en *AEE v. Maxon*, *supra*, al proceso de contratación pública o gubernamental de cualquier tipo de servicio que busque el gobierno de Puerto Rico, -- como hoy concluye una mayoría de este Tribunal --, nos parece, como previamente sentenciamos, un precedente en extremo peligroso. Dos, en esencia, son las razones que nos permiten llegar a la anterior conclusión.**

**En primer lugar, consideramos que la norma que hoy se pauta pasa por alto que el hecho de que la efectiva administración de una empresa, compañía y/o corporación conlleva muchos otros elementos que en nada se relacionan a la experiencia de su personal en el servicio a proveer.** Es decir, el conocimiento que tenga una o varias personas no necesariamente equivale a que una entidad pueda, en efecto, y en su todo, cumplir con lo acordado.

**En segundo lugar, y aún más importante, entendemos que la norma que hoy se pauta pudiese fomentar la creación de nuevas personas jurídicas cuyo único interés sea obtener contratos gubernamentales, sin la experiencia que verdaderamente se requiera para ello.** Aunque lo anterior no constituye una actuación ilegal en sí misma, sí puede propiciar prácticas turbias, que, como señalamos antes, no nos son ajenas. Ya son muchos los casos que los tribunales estatales y federales han tenido que atender sobre el particular. Lo anterior, nos resulta altamente preocupante.

IV.

En fin, nuestra inconformidad y preocupación con la determinación que hoy emite este Tribunal radica en que la misma parece ignorar las realidades que hemos reseñado en estas breves expresiones; en particular, el problema de corrupción sistemática al que, actualmente, se enfrenta nuestro País. Por ello, enérgicamente disentimos.


Ángel Colón Pérez
Juez Asociado